UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 14-cv-22712-SEITZ/TURNOFF

EMMA LIMA,

    Plaintiff,

v.

UNIVERSITY OF MIAMI,

    Defendant.
_____/

### AMENDED ORDER GRANTING SUMMARY JUDGMENT[1]

This matter is before the Court on Defendant University of Miami ("UM")'s motion for summary judgment. [DE-43.] Plaintiff Emma Lima argues that UM terminated her employment because her direct supervisor was biased against women and because she complained about the issue within UM. Given the record evidence, Lima cannot show that UM's stated reason for terminating her—her failure to complete her bachelor's degree within six months of hire, a condition specified in her offer letter—was a pretext. Thus, her discrimination and retaliation claims both fail. Therefore, Defendant's motion will be granted.

### A. FACTUAL BACKGROUND[2]

In November 2012, UM posted a job opening for a Senior Financial Analyst position requiring a Bachelor's degree and at least two years of work experience. [DE-43-2 at 2.] Lima applied. She had more than ten years of experience in financial analyst positions and had majored in finance at Florida International University ("FIU"), but

---

[1]     This Order amends the Order Granting Motion For Summary Judgment [DE-59].
[2]     Because Defendant is moving for summary judgment, all reasonable factual inferences with evidentiary support in the record are drawn in Plaintiff's favor.

she had never finished her degree because she needed to re-take two classes.[3] (Lima Dep. [DE-43-3] 11–13, 20–23, 27–31.)

Around April or May 2013, Lima was interviewed three times. First, she met with Suresh Kumar, a senior finance manager, and Gisette Onaroto, a senior financial analyst. Second, she met with Sylvain Foster, the Executive Director of Finance and Kumar's supervisor. Third, she met with Kumar and Foster. (Lima Dep. 34–39.) Foster had ultimate hiring authority. (Foster Dep. [DE-43-8] 22–23.)

About a week after the third interview, Kumar called her with the job offer and described the terms, including "the condition that they wanted [her] to finish [her] degree within six months." (Lima Dep. 44:21–22.) Lima accepted the offer and the condition, thinking she could finish her degree in the fall. (*Id.* 46–47.) Lima's offer letter, signed by Senior Recruiter Ronald Louisdhon, stated that she was "required to finish [her] Bachelors degree within 6 months" and that a failure to do so would be "grounds for termination of [her] employment." [DE-43-5 at 1.]

Lima began working in UM's Finance/Accounting Department (the "Department") on July 15. She worked closely with Gisette Onaroto and Nestor Girardello, a junior financial analyst. Lima and Girardello reported directly to Suresh Kumar, whereas Onaroto reported to Harry Goldszmidt. Most of the Department worked in the same building, and Lima interacted daily with most of them.[4] (Lima Dep. 58–61, 72–74.) Other than Lima, every financial analyst in the Department had a bachelor's degree. (Douglas Decl. [DE-43-6] 11.)

---

[3] At the time Lima thought she only needed to re-take securities analysis, but she later learned she also had to re-take financial crimes. [DE-43-17 at 26.]

[4] Although Kumar's team initially worked in a separate office in the McKnight Building, they moved soon after Lima's hire into the building with most of their coworkers.

- 2 -

Around two weeks later, Lima tried to register for the fall semester at FIU. However, the registrar told her that she first had to re-apply for admission because her student status had become inactive. She re-applied for admission but was told that she might not be reinstated in time for fall classes. She reported this to Kumar, her direct supervisor, who told her not to worry about it as long as she took the class in the spring, and that he preferred that she take the class in the spring because that would let her focus on her new job in the fall. He did not ask her for any documentation of her attempt to register for the class, and she did not provide any. She did not speak to anyone else at UM at the time about the issue. (*Id.* at 51–54, 57–58.)

Over the next few months, Lima started to notice that Kumar treated her differently from her male co-worker Girardello and that he made negative comments to Lima about her female co-workers but not her male co-workers. At some point in October, Kumar asked for feedback about his management style. She told him that he made negative comments about people and that she was concerned about his treating Girardello differently from her. (*Id.* at 88–92.) He responded that he treated them differently because Lima was a "mother" whereas Girardello was "career-driven." (*Id.* at 92.)

Soon thereafter, Lima met with Foster to discuss how her job was going. She raised her concerns about Kumar's negative comments and his differential treatment of Lima and Girardello. (*Id.* at 94–96.)

On November 6, Kumar called Lima into his office and confronted her about what she had told Foster. Lima left Kumar's office upset and told Foster what had happened. (*Id.* at 97–100, 115.) Human Resources Manager Paola Wright contacted Lima the next day, and they met a few days later to discuss the situation. According to Wright's notes from that meeting, Lima told her that Kumar had an "issue with women / can't control the situation" and that he micromanaged her but not Girardello, her male

co-worker. [DE-48-16 at 1.] Wright said that she would schedule a team meeting to discuss the matter further. (Lima Dep. 100–01, 104–05.) According to Wright, she investigated Lima's complaint but did not treat it as a discrimination complaint because gender discrimination "didn't come up." (Wright Dep. [DE-48-7] 119:24 – 120:8.)

On November 13, Foster issued a written warning to Kumar for failing to communicate professionally with his staff, particularly on November 6 towards Lima. The warning noted that Foster had met with Kumar in August and October of that year to discuss his unprofessional communication style and particularly his habit of making negative comments about coworkers in front of other employees. It reiterated UM's expectations going forward and required Kumar to attend several classes and to participate in a "management team coaching session." However, it did not reference any allegation of gender-based discrimination or disparate treatment. [DE-43-11.]

Also on November 13, Lima emailed Wright to ask if the meeting would include Kumar, and Wright confirmed that it would. [DE-43-12.] Sometime thereafter, Wright asked Kumar to "minimize his conversations with [Lima] until we were all able to sit down in a team meeting because we did not want to escalate the situation further." (Wright Dep. 86.) However, Lima was not informed of this. On November 26, Lima emailed Wright to follow up on the team meeting and stated that her work environment had gotten worse because Kumar had stopped communicating with her to the point of excluding her from work meetings. Wright responded that the meeting would take place the following Thursday. [DE-43-13.]

On December 5, a meeting took place with Lima, Girardello, Kumar, Foster, Wright, and newly-hired Executive Director of Finance Alan Gomez.[5] Wright told Lima that the matter had been addressed, that Kumar had no ill intentions, and that the best resolution would be for everyone to "move forward." She did not mention that UM had issued a written warning to Kumar. Lima responded that she could not simply move forward because her concerns had not been addressed and Kumar had never apologized or acknowledged that he had done anything wrong. Lima was not asked how she wanted UM to address the situation. (Lima Dep. 119–122.)

After that meeting, Gomez, Foster, and Wright discussed how to proceed. Gomez concluded that Lima and Kumar would not be able to work together.[6] He, Foster, and Wright decided to remove Lima from Kumar's supervision and to move her physical office to the McKnight Building. Soon thereafter, Gomez and Kumar had a brief discussion in which Kumar criticized Lima's work performance and told Gomez that Lima still needed to complete her degree. Sometime after that discussion, Gomez, Foster, and Wright decided that Lima would report directly to Gomez. (Gomez Dep. 7–9, 16, 19–26.)

Lima was not consulted before these decisions and was not happy with the move. (*Id.* at 18; Foster Dep. 71, 94.) Because she was separated from her coworkers, it was harder to reach out for new assignments or to work on team projects, and she began to feel isolated. (Lima Dep. 125–135.)

---

[5]     Gomez replaced Foster as the Executive Director of Finance on November 18. Before then, he did not work at UM or otherwise know Lima. (Gomez Dep. [DE-43-14] 6–7.) Foster was promoted and ultimately became associate Chief Financial Officer in July 2014. (Foster Dep. 7.)

[6]     The record is unclear as to whether Gomez or Wright knew at the time that Lima's offer letter required her to complete her degree within six months, but Wright's notes from the meeting suggest the issue was raised as a "concern." [DE-48-16 at 12.]

On December 16, Gomez emailed Lima to ask for an update on her progress towards completing her degree. Lima responded that she had been unable to register for her class in the fall but had registered for the spring, and that she had asked Kumar in July what she needed to do about the issue and that he told her not to worry about it. Gomez asked her to document her efforts towards completing her degree. [DE-43-15.] She responded by providing the letter showing her reinstatement for the spring semester. [DE-48-7 at 73.] This was the first time that Lima told anyone at UM other than Kumar about her inability to register for the fall semester.

Sometime after that, Gomez decided to recommend that Lima be terminated for failing to finish her degree within six months. According to Foster, Gomez "made the decision" and Foster "did not override it."[7] (Foster Dep. 30.) According to Foster and Gomez, they did not explore whether Lima's deadline could be extended because they thought her work product had been poor. (*Id.* at 34–40; Gomez Dep. 34–43.) On January 8, 2014, Gomez informed Lima that she had been terminated. [DE-43-16.]

Sometime in early 2014, Kumar informed Girardello that he was up for a promotion from junior financial analyst to senior financial analyst. His promotion took effect in June 2014. (Girardello Dep. [DE-48-8] 14, 17.)

## B. DISCUSSION

Lima asserts claims for sex discrimination and retaliation under both Title VII and the Florida Civil Rights Act, which both employ the same legal analysis. *See Valenzuela v. GlobeGround N. Am., LLC*, 18 So. 3d 17, 21 (Fla. 3d DCA 2009) (citing *Harper v. Blockbuster Enter. Corp.*, 139 F.3d 1385, 1387 (11th Cir.1998)). Because Lima's case rests

---

[7]    Executive Director of Human Resources Errol Douglas asserts that he alone decided to terminate Lima [DE-43-6 ¶ 13], but this assertion is not considered at summary judgment because it is inconsistent with Foster's deposition testimony.

on circumstantial evidence, *McDonnell Douglas Corp. v. Green* applies. 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, a plaintiff who establishes "facts adequate to permit an inference of discrimination" has a *prima facie* case of discrimination. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008). The employer can rebut the presumption of discrimination by proffering a "legitimate, non-discriminatory reason" for the adverse employment action. *Id.* If the employer satisfies this burden of production, the burden shifts to the plaintiff to show that the employer's proffered reason was a pretext for discrimination. *Id.*

### 1. Lima Cannot Make a *Prima Facie* Case of Discrimination

For a *prima facie* case of employment discrimination, a plaintiff must show that: (1) she belongs to a protected class, (2) she was qualified for the job, (3) the employer took an adverse employment action, and (4) in taking the adverse employment action, the employer treated her less favorably than a similarly-situated person outside the protected class. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 (11th Cir. 2011). Here, Lima cannot satisfy the second element.

To establish qualification for the job, a "plaintiff need only show that he or she satisfied an employer's objective qualifications." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005). This inquiry disregards the "employer's subjective evaluations of the plaintiff," such as job performance, and focuses solely on "evidence that is objectively verifiable and either easily obtainable or within the plaintiff's possession." *Id.* (emphasis omitted). The requirement that Lima finish her degree within six months is an objective qualification. The posted job description required a bachelor's degree. Lima's job offer made an exception by allowing her six months to meet this requirement, but she failed to do so.

Lima argues that Kumar had apparent authority to waive or extend Lima's deadline to complete her degree. [DE-46 at 12–13.] However, apparent authority only exists if "a principal represents that an agent has authority to act and a third party reasonably relies on [the principal's] representation to his detriment." *Mallory & Evans Contractors & Engineers, LLC v. Tuskegee Univ.*, 463 F. App'x 862, 866 (11th Cir. 2012). "The acts of the agent, standing alone, are insufficient to establish that the agent is authorized to act for the principal." *Stalley v. Transitional Hospitals Corp. of Tampa*, 44 So. 3d 627, 630 (Fla. 2d DCA 2010). Lima can point to no evidence that UM, or any person authorized by UM, represented to her that Kumar had authority to modify the degree-completion deadline. The mere fact that Kumar was her supervisor does not cloak him with the authority to change the terms of her employment. Because Lima did not satisfy the employer's objective qualification that she complete her degree within six months, she was not qualified for the job, and she cannot make a *prima facie* case of discrimination.

### 2. Lima Cannot Show Pretext

Even if Lima could make a *prima facie* case, UM has proffered a "legitimate, non-discriminatory reason" for her termination: her failure to complete her degree within six months. Lima has submitted no record evidence showing this reason was a pretext.

An employee can show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). To show that it is unworthy of credence, an employee must point to "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a

reasonable factfinder could find them unworthy of credence." *Vessels*, 408 F.3d at 771. As long as the proffered explanation is "one that might motivate a reasonable employer," an employee cannot rebut it simply by "quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

Lima cannot point to weaknesses or implausibilities in UM's explanation. The posted job description required a "Bachelor's Degree in Finance or related field." [DE-43-2 at 1.] Although UM made an exception to this when it hired Lima, her offer letter required her to finish her degree within six months. [DE-43-5 at 1.] She understood this requirement as a "condition" (Lima Dep. 44:21–22) but failed to finish her degree within six months. Although Lima now argues that UM could have waived or extended the six-month deadline to complete her degree, this is irrelevant unless UM treated men and women differently in this regard, such as by extending similar deadlines for men but not for Lima. *See Smith*, 644 F.3d at 1341. There is no evidence of such differential treatment in this case. In fact, Lima's six-month deadline was an accommodation that nobody else received. Everyone else of comparable rank in the Department already had a bachelor's degree.

Therefore, Lima can only survive summary judgment by pointing to evidence that UM was more likely motivated by discriminatory reasons. In this regard, she argues that her termination was ultimately motivated by Kumar's bias because when Gomez terminated her, he simply rubber-stamped a recommendation from Kumar. However, this theory of causation requires a showing that "the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). Here, there is no record evidence that Gomez followed a biased recommendation from Kumar when he decided to terminate Lima. First, there is at most a scintilla of evidence that Kumar even made a "recommendation" to terminate. The only record evidence is of a

brief discussion in which Kumar criticized Lima's work performance and stated that Lima still needed to complete her degree. (Gomez Dep. 20–22.) Second, Gomez independently investigated whether Lima would complete her degree in time. [DE-43-15.] He was also Lima's direct supervisor for a month, enabling him to observe her job performance directly. There is no evidence that Gomez's investigation of these matters was tainted by bias. Therefore, the fact that Kumar made certain comments to Gomez does not support a reasonable inference that Gomez was a mere conduit through which Kumar effectuated Lima's termination. Because Lima has not presented any other evidence that her termination was discriminatory, her discrimination claim fails.

### 3. Lima Cannot Show that a Retaliatory Motive Caused Her Termination

Lima also argues that UM terminated her because she complained about Kumar's gender-based treatment of her. Retaliation claims are analyzed under a variant of the *McDonnell Douglas* framework for discrimination claims. An employee makes a *prima facie* case "by showing (1) that she engaged in statutorily protected activity, (2) that she suffered a materially adverse action, and (3) that the protected activity caused the adverse action." *Clark v. S. Broward Hosp. Dist.*, 601 F. App'x 886, 896 (11th Cir. 2015) (citing *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012)). Once a *prima facie* case is made, "the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment action, which the plaintiff can rebut with evidence of pretext." *Id.* Ultimately, a plaintiff must show that "the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013); *see also Pennington v. City of Huntsville*, 261 F.3d 1262, 1269 (11th Cir. 2001) (no liability if "the employer would have made the same disputed employment decision in the absence of the alleged bias").

The first two elements of a *prima facie* case are met: Lima complained about Kumar in November 2013 and was terminated on January 8, 2014. Her papers appear to argue for causation by suggesting that she was exposed to a "pattern of antagonism" that began after her complaint, culminating in her termination. *See Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392, 1405 (S.D. Fla. 2014) (causation may be inferred from either "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory act" or "a pattern of antagonism coupled with timing"). She points to two actions in particular. First, starting in November, Kumar ignored her and excluded her from work meetings. Second, after she insisted on December 5 that UM do more than tell her to "move forward," she was transferred to the McKnight Building, isolating her from her team and inhibiting her ability to work on team projects or seek out new assignments. [DE-46 at 15, 18–20.]

However, assuming that this makes a *prima facie* case, Lima cannot show pretext. First, as discussed above in the analysis of her discrimination claim, she cannot show that UM's proffered explanation for her termination—her failure to complete her degree—is unworthy of credence. Second, the record shows that UM had legitimate reasons for the other two actions that Lima contends make up a "pattern of antagonism." As for Lima's perception that Kumar was ignoring her, Wright had asked Kumar to minimize his conversations with Lima until after the team meeting to avoid escalating tensions between Kumar and Lima.[8] (Wright Dep. 86.) As for Lima's transfer out of Kumar's supervision and into the McKnight Building, this was a reasonable solution given Gomez's conclusion from the December 5 meeting that Lima and Kumar

---

[8]    Perhaps if Wright had explained this to Lima at the time, it would have avoided leaving Lima with the impression that she was being ostracized. But 20/20 hindsight does not establish that a de-escalation attempt was a pretext for retaliation.

- 11 -

could no longer work together.[9] Because a reasonable factfinder could not conclude from the facts in the record that a desire to retaliate was the but-for cause of Lima's termination, her retaliation claim fails.

Because there is no genuine issue of material fact when the record evidence is viewed in the light most favorable to Lima, UM is entitled to summary judgment on both of Lima's claims. It is hereby

ORDERED that

1) Defendant's motion for summary judgment [DE-43] is GRANTED.

2) This case is DISMISSED WITH PREJUDICE.

3) This case is CLOSED.

4) Any pending motions not otherwise ruled upon are DENIED AS MOOT.

DONE AND ORDERED in Miami, Florida, this 21st day of July, 2015.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

---

[9] Although Lima argues that Gomez did not consult her before making this decision, she suggests no viable alternative placement. Moreover, the Court is not a "super-personnel department that reexamines an entity's business decisions." *Chapman*, 229 F.3d at 1030 (citation omitted).